Helen D. HARBAUGH and John P. Harbaugh, Plaintiffs-Appellants,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a National Banking Association, Defendant-Appellee.

No. 78–2386.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1979.

Decided Jan. 28, 1980.

Rehearing and Rehearing In Banc Denied May 2, 1980.

Keith E. Morehead, Chicago, Ill., for plaintiffs-appellants.

Susan S. Sher, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Circuit Judge, MOORE, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

MOORE, Circuit Judge:

Plaintiffs, Helen D. Harbaugh and John P. Harbaugh, husband and wife, appeal from a final judgment entered in the Northern District of Illinois (Honorable Abraham Lincoln Marovitz, *District Judge*), granting defendant Continental Illinois National Bank and Trust Company's motion for summary judgment in its favor and denying plaintiffs' cross-motion for summary judgment. The trial court had before it the pleadings, interrogatories and answers thereto and numerous affidavits and exhibits. It found, quite accurately, that, as the parties agreed, there was "no genuine issue of material facts".

This controversy arises out of asserted violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* (1974) ("ECOA"). A "First Cause of Action" brought by Helen D. Harbaugh alleges that

---

* The Honorable Leonard P. Moore, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

the refusal of Continental Illinois National Bank and Trust Company (hereinafter "Continental" or "the bank"), to issue to her a Master Charge credit card constituted "discrimination against plaintiff on the basis of her sex or marital status", an alleged violation of 15 U.S.C. § 1691(a) and (b) (1974) and 12 C.F.R. §§ 202.2 and 202.3(1) (1978) and that the issuance of a Master Charge card to John P. Harbaugh was "a refusal to grant a separate account to [her] on the basis of her sex or marital status." (Compl. ¶¶ X and XI). These acts, plaintiff claims, caused "great mental distress, humiliation and aggravation" to her damage. (Compl. ¶¶ XII and XIII). A "Second Cause of Action" brought by the husband John P. Harbaugh alleges that the issuance to him of an unsolicited Master Charge credit card was a violation of his rights under 15 U.S.C. § 1642 (1974) to his monetary damage.

Sometime prior to March 12, 1976, Continental sent an unsolicited application for a Master Charge credit card to Mr. John P. Harbaugh. The Harbaughs crossed out the word "Mr.", typed above the deleted "Mr." the word "Mrs.", and inserted certain statistical information about Mrs. Harbaugh such as her employment as a teacher, her employer (the Chicago Board of Education), and her salary. As thus prepared, the application was signed "Mrs. John P. Harbaugh" dated March 12, 1976, and sent to Continental. In this form Continental forwarded the application to Credit Information Corporation of Chicago ("CICC"), a company used by Continental for credit report purposes. CICC made a practice of not using "courtesy" titles [1] in its credit investigations. Accordingly, when it requested a confidential employee's report from the Chicago Board of Education, the Board replied that it had no record of a John P. Harbaugh as an employed teacher. Continental so advised Mrs. Harbaugh who straightaway supplied the desired information. Mrs. Harbaugh's employment being confirmed, Continental issued two credit cards in the name of John P. Harbaugh.

Mrs. Harbaugh was aware that she had the authority to use the credit cards received and retained by them and that she could sign them Mrs. John P. Harbaugh or Mrs. Helen D. Harbaugh. (Deposition of Mrs. Harbaugh at 17). However, John P. Harbaugh did not regard the cards as satisfactory and wrote Master Charge on June 24, 1976 that he did not order the card and that its issuance was a "tactic to avoid issuing a card to my wife, Helen D. Harbaugh".

Asserting that Continental's acts constituted "[d]iscrimination against women in granting financial credit" and amounted to "sexual discrimination", John P. Harbaugh on September 10, 1976 wrote to the Comptroller of the Currency, Treasury Department, Consumer Affairs Division, in Washington, and invited investigation. He sent copies of his letter to his Congressman, Philip M. Crane, and to Senator Adlai Stevenson. Congressman Crane referred the matter to another federal agency, the Federal Trade Commission ("FTC"). The FTC replied that it was "unable to take any action on Mrs. Harbaugh's behalf" but suggested contacting the Comptroller of the Currency. Having received no reply from the Comptroller of the Currency after fifteen weeks, John Harbaugh wrote the Director, Office of Saver and Consumer Affairs, Board of Governors, Federal Reserve System, stating that he had learned that "your organization was established to help administer a wide varity [sic] of consumer legislation without being intimidated by the large banks". (Deposition of Mr. Harbaugh). Copies of this letter were sent to Senator Stevenson, Congressman Crane, and a representative of the American Association of Retired Persons. In turn, the Director of the Office of Saver and Consumer Affairs forwarded this letter to the Comptroller of the Currency. The Office of the Comptroller, without giving Continental an opportunity to state its case, gave as its

---

1. A courtesy title is defined, for example, as Mrs., Mr., Miss, Ms., Captain, Colonel, Judge, etc.

opinion that Continental's action had violated the ECOA, 15 U.S.C. § 1691 *et seq.* (1974), Regulation B, (12 C.F.R. § 202 (1978)), and 15 U.S.C. § 1645 (1974), and wrote Mr. Harbaugh that "You may wish to discuss with your attorney the remedies available to you under 15 U.S.C. 1640 and 15 U.S.C. 1691". Thus far, the Harbaughs had consulted the Legislative and Executive branches of government; then the Comptroller of the Currency suggested that the Judiciary be added to complete the triumvirate.

Certain other events occurred. On February 5, 1977 Continental advised John P. Harbaugh that the cards were to be reissued and requested Mr. Harbaugh to correct erroneous information. The Harbaughs returned the notice, giving the name of Helen D. Harbaugh as the applicant. On March 25, 1977, Continental reissued the two Master Charge cards in the name of John P. Harbaugh.

Presumably acting upon the Comptroller's suggestion, the Harbaughs brought suit on June 3, 1977. The trial judge found that "On November 18, 1977, purportedly in an attempt to settle the pending lawsuit, Continental issued a Master Charge credit card in the name of Helen D. Harbaugh". The trial judge granted defendant's motion for summary judgment and denied plaintiffs' cross-motion for summary judgment. From this ruling, plaintiffs appeal.

The primary thrust of Mrs. Harbaugh's claim on appeal is that Continental's issuance of a credit card in the name of John P. Harbaugh was a discriminatory denial of credit on the basis of her sex or marital status, in violation of the Equal Credit Op-

portunity Act, 15 U.S.C. § 1691 (1974).[2] It should be noted that Mrs. Harbaugh does not claim that she could not *use* the Master Charge card issued in the name of her husband.[3] Instead, Mrs. Harbaugh's claim is that Continental unlawfully discriminated by refusing to open a credit account which would reflect her individual credit transactions and establish her own credit history, separate and apart from her husband. She stated that her intent in applying for a Master Charge card was to have her own account and her own credit rating in case something should happen to her husband. (Deposition of Mrs. Harbaugh at 29).

In response, Continental asserts that Mrs. Harbaugh was the recipient of credit from the bank. Before issuing the cards, Continental investigated her credit and verified her employment. However, Continental admits that while Mrs. Harbaugh did get her own account at the bank, she did not establish a separate credit history at the credit bureau. As Mr. Sheahen of CICC stated in his affidavit, an account in the name of "Mrs. John P. Harbaugh" would have the identical effect as a card in the name of "John P. Harbaugh": no independent credit history would thereby be established for Helen Harbaugh at the credit bureau.

Thus, this case poses the question of whether a creditor, using a computer format which excluded all courtesy titles, is under a statutory duty to correct or supplement the manner in which it processes a credit application by a married woman in her marital name in order to insure that she receive a separate credit history. In other words, Mrs. Harbaugh makes two alternative claims under the ECOA: (1) the bank

**2.** 15 U.S.C. § 1691(a)(1) (1974) provides: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction— (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); . . ."

**3.** The evidence shows that credit cards and their form of issuance were not unknown to the Harbaughs. Thus, Continental's practice of putting the card in the name of John P. Harbaugh and issuing two cards, one for the hus-

band and one for the wife, was well known to them. In view of these facts, Mrs. Harbaugh's failure to use the card as issued did not stem from any belief that she was not entitled to use it. Further, Ed Skonicki, Second Vice President of Continental in charge of the credit granting and collection functions of the Charge Card Division, asserted that "Had she chosen to do so, Mrs. Harbaugh could have used the Master Charge card as issued to her". Skonicki Affidavit, Exh. 2, ¶ 10. On appeal, Mrs. Harbaugh does not challenge this statement.

was under an affirmative duty to use the courtesy title "Mrs." in opening her account *or* (2) if the courtesy title of "Mrs." was deleted, the bank was under a duty to insure that she receive a separate credit history in her own name. The bank apparently could fulfill its duty under the second alternative either by voluntarily ascertaining from her a proper means of identification other than "Mrs. John P. Harbaugh" or by advising her of its practice of deleting courtesy titles in processing.

We reject the claim that the bank was under an affirmative duty to use the courtesy title "Mrs." in opening Mrs. Harbaugh's account. The ECOA and its corresponding regulations expressly prohibit a creditor from requesting an applicant's sex or marital status.[4] Thus, a creditor's mandatory requirement that an applicant supply a courtesy title would violate the intent of the statute. However, neither the statute nor the regulations address the question of a creditor's response to a courtesy title *voluntarily* supplied by a married woman applying in her marital name. As there is no affirmative requirement in the legislation requiring a creditor to utilize a courtesy title in opening or maintaining an account, Continental was not required to use the courtesy title supplied by Mrs. Harbaugh.

We also reject Mrs. Harbaugh's alternative claim that, if Continental chose a computer format which deleted courtesy titles, it was under a duty to correct the "inherent discriminatory effects" of such a practice. Mrs. Harbaugh asserts that, when Continental received her application in the name of "Mrs. John P. Harbaugh", it was put on notice that processing of the application without the courtesy title "Mrs." would deny her the individual account she sought.

Thus, she argues that Continental was under a statutory duty either to inform her of its practice of deleting courtesy titles or to voluntarily ascertain her first given name before opening the account.

Without statutory or regulatory authorization, we decline to impose these affirmative duties on a creditor such as Continental. In this respect, we note that certain affirmative duties are imposed on creditors by Regulation B. *See* 12 C.F.R. § 202.10 (1978). Under 12 C.F.R. § 202.10(b), for every account established prior to June 1, 1977, creditors were required to send a notice that married women are entitled to have their credit histories reported in their own name. The notice informed the recipient that credit information relating to the account could be reported in the name of both the wife and the husband if both used or were responsible for the account. In this case, there is no allegation by plaintiffs that Continental failed to send them such a notice as required by law. Indeed, Mrs. Harbaugh stated that she had responded to such notices sent by Marshall Field, Carson Pirie Scott, and Bank Americard. (Deposition of Mrs. Harbaugh at 31). In view of the fact that the Federal Reserve Board promulgated regulations establishing a mechanism whereby creditors were required to inform married women how to° establish their own credit histories, the imposition of more stringent duties upon the creditor (as urged by Mrs. Harbaugh), is not warranted.

Nor is there a statutory requirement that a creditor voluntarily inquire as to a married woman's given first name upon receiving an application in her marital name. Such a requirement would place the creditor in an untenable position. Had Continental written to Mrs. Harbaugh, re-

---

4. Regulation B, 12 C.F.R. § 202.5(d)(1) (1978), provides that if an applicant applies for an individual account, "a creditor shall not request the applicant's marital status. . . ." Furthermore, § 202.5(d)(3) provides:

"A creditor shall not request the sex of an applicant. An applicant may be requested to designate a title on an application form (such as Ms., Miss, Mr., or Mrs.) if the form appropriately discloses that the designation of such a title is optional. An application form shall otherwise use only terms that are neutral as to sex."

The Illinois Credit Card Issuance and Use Act is even more restrictive:

"No question requesting any information concerning an applicant's marital status shall appear on any credit card application . . ."

Ill.Rev.Stat., Ch. 121½, § 385.1.

1174

questing that she supply her first name, it would have been risking an accusation that it had violated two sections of Regulation B: § 202.5(d)(3), which prohibits creditors from requesting information with respect to the applicant's sex and § 202.5(a),[5] which prohibits the creditor from any statements which would discourage a reasonable person from pursuing an application. Furthermore, had the bank investigated into other source documents to discover the applicant's first name, and then issued a card in a name *other* than that supplied by the applicant, the bank could possibly be accused of issuing an unsolicited credit card, in violation of the Truth in Lending Act, 15 U.S.C. § 1642 (1974). Thus, we find that the bank did not err by failing to inquire as to Mrs. Harbaugh's given name.

■ There is no proof (and none was even offered by plaintiffs) that Continental in its actions discriminated in any way against the Harbaughs as they charged "on the basis of . . . sex or marital status . . . ."—hence there has been no violation of law.

We find it unnecessary to discuss plaintiffs' other claims, which are without merit.

Judgment Affirmed.

FAIRCHILD, Chief Judge, dissenting.

The majority opinion seems to concede that Mrs. Harbaugh was denied a separate credit account (and, by implication, that Mr. Harbaugh was issued an unrequested card) but finds no violation of the Act, holding that the Act does not specifically require the bank to establish an individual account for Mrs. Harbaugh since she applied using the name "Mrs. John Harbaugh." But it was not Mrs. Harbaugh who created the difficulties she encountered—it was the

bank's computers, some of which, at least, have not been programmed to identify Mr. John Doe and Mrs. John Doe as two different persons. Thus an application from Mrs. Doe (or Mrs. Harbaugh) causes a credit card to be issued in the husband's name only. The statutory requirements are clear—there is no exception for good faith computer programming deficiencies. It is the bank's obligation to comply with the law, making whatever adjustments in its application forms or computer programs necessary to meet the requirements of the statute.[1]

Aside from what seems to me to be a fairly straightforward example of a denial of credit, there are several aspects of this case that particularly intrigue me.

First, as the majority opinion notes, there were at least two alternative choices available to the bank when Mrs. Harbaugh's application was received even given the claimed inflexibility of the bank's computers. The bank could have established an account in the name of Helen Harbaugh (which it had learned was her name) or it could have written to her explaining the problem and asking for instructions. The bank, however, did neither. Instead it established an account in the name of "John Harbaugh." The majority seems to hold that the latter course of action was more in keeping with the letter and the spirit of the Act than either of the first two would have been. I strongly disagree.

Second, although the bank asserts that its practice of deleting courtesy titles "is in accordance with the aims of the equal credit opportunity laws to ensure that the credit granting process is 'neutral as to sex'" (appellee's brief, p. 14) the bank does use courtesy titles in some of its dealing with cus-

---

**5.** 12 C.F.R. § 202.5(a) (1978) provides:
"A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."

**1.** I would not reach the question of what sort of adjustments might be required. I note, however, that this entire lawsuit could have un-

doubtedly been avoided if the bank's application forms included a note that courtesy titles are not used on charge cards and suggesting, therefore, that applicants be certain that the first and last names on the application are the names desired on the account. Instead, as noted further, the bank sends out partially completed application forms which include the courtesy titles of the potential applicants.

tomers and indeed used courtesy titles in its dealings with the Harbaughs. The application which Mr. Harbaugh received in the mail had the name "Mr. John Harbaugh" already typed in. Mrs. Harbaugh crossed out "Mr." and typed in "Mrs.", signing the application the same way. When the bank (now omitting the courtesy title) could not obtain verification that "John Harbaugh" was employed by the Chicago Board of Education it wrote a letter not to "John Harbaugh" but to "Mrs. John Harbaugh" to inform her of its inability to verify her employment. Obviously at least some of the bank's computers (or perhaps some of its employees) are trained to use courtesy titles and the bank apparently considers it appropriate to use them in some instances.

The third point that intrigues me is the suggestion that a married woman's designation of herself as, for example, "Mrs. John Doe" is so extraordinary that a credit lending institution cannot reasonably be expected to process a credit application from someone who refers to herself in that fashion. There are over sixty million married or widowed women in this country who Emily Post and Amy Vanderbilt still insist are properly addressed only as "Mrs." followed by their husband's names.[2] The strictures of etiquette are more relaxed today than they were forty years ago when the Harbaughs were married, but the older usage is not so archaic that a credit lending institution can simply ignore its existence.

Finally, I note that the majority is affirming on a ground not relied on by the district court and, indeed, not argued by the bank on appeal. As the majority opinion notes, the bank's argument both in the district court and here has been that Mrs. Harbaugh was not denied credit because the Master Charge cards sent to the Harbaugh home with the name John P. Harbaugh on them were *her* cards, issued in *her* name (albeit without her courtesy title) and for her use. The district court, granting summary judgment to the bank, accepted this argument but also held that it would have been a violation of the Act if the bank had issued a card to "Helen Harbaugh" because one section of Regulation B (12 C.F.R. § 202.7(b)) requires creditors to use the *surname* (birth-given, spouse's or combined) of the applicant's choice. The bank prudently chose not to defend that aspect of the district court order and the majority has now, I believe with equal wisdom, rejected the only other ground on which the district court judgment rested.[3] The majority nonetheless affirms the judgment.[4]

The statutory requirements are clear. Mrs. Harbaugh was denied credit in violation of those requirements. The bank should not be permitted to hide the violation behind its choice of computer formats. I would reverse the decision of the district court and remand the case for entry of judgment in favor of the Harbaughs.

---

**2.** Amy Vanderbilt describes the use of "Mrs." followed by a woman's given name instead of her husband's name as an "insult" to proper social nomenclature and an "indignity." Amy Vanderbilt, *Amy Vanderbilt's Etiquette* (New York: Doubleday & Co., 1972, pp. 42, 544). Etiquette authorities would also insist, of course, that it is normally improper for a woman to use "Mrs." in her signature (as Mrs. Harbaugh did). There are exceptions, however. To quote Emily Post

"The only times when a woman actually uses 'Mrs.' in her signature are in a hotel register, on a business telegram, *on a charge account,* or in a letter ordering a purchase from a store. *And then it must be 'Mrs. John Smith.'*" (Emphasis added.)

Emily Post, *Emily Post's Etiquette,* 12th revised edition by Elizabeth L. Post (New York: Funk & Wagnalls, 1969).

**3.** It is, of course, irrelevant that Mrs. Harbaugh had the right to use the cards issued in her husband's name. That right arose only out of her marital status. The Act gives married women the right to obtain their own credit, independent of their marital status.

**4.** Unless, of course, one accepts the proposition that John P. Harbaugh is the name of Helen Harbaugh, and the cards issued to John P. Harbaugh are therefore her cards, it necessarily follows that Mr. Harbaugh correctly claimed he had received an unsolicited card.